United States District Court
District of Massachusetts

|  |  |  |
|---|---|---|
| United States Securities and Exchange Commission, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 16-10607-NMG |
| David Johnston, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM & ORDER**

**GORTON, J.**

Following an eight-day trial after which the jury found David Johnston ("Johnston" or "defendant") liable for securities violations, the Securities and Exchange Commission ("the SEC") has moved for final judgment. The SEC seeks an officer and director bar, disgorgement, prejudgment interest, civil penalties and a permanent injunction.

I. **Background**

In 2016, the SEC filed a complaint against defendant, alleging that Johnston, as Chief Financial Officer ("CFO") of Aveo Pharmaceuticals ("Aveo") engaged in a scheme to mislead Aveo investors about the pending approval by the Food and Drug Administration ("FDA") of Aveo's flagship drug, tivozanib

("Tivo").[1]  The SEC alleged that the scheme to defraud occurred between August, 2012, and April, 2013.

In May, 2012, Aveo representatives attended a pre-New Drug Approval ("NDA") meeting, where the FDA 1) expressed concerns about the negative results of Tivo's overall survival data in its first clinical trial and 2) recommended that Aveo conduct a second randomized trial with respect to Tivo.  Three months later, Aveo issued a press release which disclosed the negative overall survival data but did not disclose the FDA's recommendation to conduct a second clinical trial.  In the meantime, Johnston and his team developed a communications strategy which emphasized that Aveo could not "speculate" as to future FDA actions, despite knowing about the FDA's recommendation.  After Aveo issued its August, 2012, press release Johnston participated in several conference calls with stock analysts that obfuscated the situation.

Shortly after its August, 2012, press release, Aveo filed its Tivo NDA with the FDA without conducting a second clinical trial.  In February, 2013, FDA staff informed Aveo that the Oncologic Drugs Advisory Committee ("ODAC") would be reviewing the sufficiency of Tivo's first clinical trial the following

---

[1] The SEC's complaint also brought claims against Aveo Pharmaceuticals, Tuan Ha-Ngoc and William Slichenmyer, all of which have been settled.

May.  One month later, the FDA publicly disclosed that it had previously recommended that Aveo conduct a second trial for Tivo.  Following the FDA's public disclosure in April, 2013, Aveo's stock price dropped by 31%.  The next month, the FDA's ODAC panel rejected the adequacy of Aveo's first clinical trial by a vote of 13 to 1.

Throughout the trial, Johnston argued that his decision not to disclose was in good faith because he relied on the corporate process in connection with Aveo's disclosures.  Specifically, he referred to opinions of Aveo's outside counsel, the underwriters' counsel and internal executive committees to justify his defense.  After eight days of trial, the jury returned a verdict for the SEC, finding that Johnston violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") and Sections 17(a)(2) and (a)(3) of the Securities Act and Rule 13a-14 of the Exchange Act.

**II. Analysis**

  A. **Officer and director bar**

The SEC seeks to bar Johnston from serving as an officer and director of a public company for the aforementioned securities violations.  Pursuant to 15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2), district courts exercise "substantial discretion" in deciding whether to bar an individual from

serving as an officer and director in a public company. SEC v. Selden, 632 F. Supp. 2d 91, 96-97 (D. Mass. 2009).  To that end, the Second Circuit has established six factors for determining whether an individual is "unfit":

> 1) the egregiousness of the underlying securities law violation; 2) the defendant's repeat offender status; 3) the defendant's role or position when he engaged in the fraud; 4) the defendant's degree of scienter; 5) the defendant's economic stake in the violation; and 6) the likelihood that misconduct will recur.
>
> SEC v. Patel, 61 F.3d 137, 141.

While the Patel factors are instructive with respect to the unfitness assessment, they are not exhaustive and it is not necessary to apply all of the factors in every case. Id.  In light of the Patel factors, the Court proceeds to consider whether Johnston's conduct supports imposing an officer and director bar pursuant to 15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2).

**1. Egregiousness**

The SEC argues that Johnston's conduct was egregious because, as the head of Aveo's corporate communications and investor relations, he led a deceptive scheme to mislead investors by 1) omitting material information, 2) drafting scripted responses to avoid investor questions about the FDA's clinical trial recommendation and 3) continuing to engage in selective disclosure at four investor conferences.  Johnston

responds that a jury finding that he violated securities law does not mean that his conduct was egregious per se. Rather, he contends that lifetime bars are reserved for more serious violations such as boiler-room, pump-and-dump or pyramid schemes.

Although Johnston as the head of Aveo's corporate communications undoubtedly led this deceptive scheme, his selective disclosure was limited to a few months, not years, and his disclosures, while materially misleading, are not so egregious as to warrant a lifetime bar. Cf. SEC v. Weed, 315 F. Supp. 3d 667, 677-78 (D. Mass. 2018) (imposing a lifetime bar where the defendant played an essential role in a pump-and-dump scheme); SEC v. Selden, 632 F. Supp. 2d 91, 97 (D. Mass. 2009) (finding serious violations when defendant engaged in affirmative misstatements over a period of several years). Although Johnston's violations were serious, they were not particularly flagrant.

**2. Repeat offender**

The SEC concedes that this is Johnston's first offense and Johnston, to no surprise, points to his 30-plus years of compliance with securities laws both before and after the deceptive scheme in 2012. Thus, Johnston does not qualify as a "repeat offender".

### 3. Defendant's role or position during the fraud

The Court agrees with the SEC's contention that Johnston played a significant role during the scheme to defraud. As Aveo's CFO, he was responsible for certifying Aveo's public filings and for Aveo's corporate communications. His disclosures (or lack thereof) in his role as CFO misled investors. Johnston contends, however, that his conduct during the fraud is mitigated by the fact that he relied on Aveo employees, regulatory experts and counsel, who collectively advised him on the appropriate level of disclosure. Moreover, Johnston submits that neither Aveo's CEO nor its CMO, both of whom settled the SEC claims against them, have been barred from serving as an officer or director of a public company. Such a bar against him would therefore not be commensurate with the penalties imposed against other senior officers who also participated in the fraud.

The Court is not persuaded by Johnston's latter argument that his penalty should be commensurate with that of the former CEO and CMO of Aveo. As the SEC avers in its reply, Dr. Slichenmyer (CMO) promised not to work as an officer in a public company and Tuan Ha-Ngoc (CEO) settled lesser charges of negligence. Thus, the Court finds that Johnston did play a significant role in this scheme to defraud.

### 4. Defendant's scienter

Johnston argues that he lacked "actual intent" to defraud and, at most, acted recklessly. In support of that claim, he points to the fact that 1) he disclosed the negative overall survival data from Tivo's first clinical trial, 2) he increased his stock holdings during the fraudulent scheme, 3) it was unclear if the FDA would allow Aveo to conduct the second trial post-NDA approval, 4) it was ambiguous as to whether the FDA's recommendation was merely "interim" agency feedback that did not warrant public disclosure and 5) counsel for the underwriters in Aveo's public offering affirmed that Aveo did not have a duty to disclose despite knowing about the FDA's recommendation.

Notwithstanding the fact that the jury found that Johnston acted with either "actual intent" or a "high degree of recklessness", the Court concludes that Johnston knew, or certainly should have known, based on his 14 years in the industry, that failing to disclose the FDA's recommendation would materially mislead investors. On the other hand, the Court acknowledges that Johnston did face factual or legal ambiguities during the fraudulent scheme. There was a slight chance that the FDA would accept Tivo's second clinical trial post-NDA and that the FDA's "recommendation" was just a recommendation. But whether or not the official "recommendation" was ambiguous, the record demonstrates that it

was a substantial obstacle to Tivo's approval to market and Johnston knew it.

Nor does Johnston's disclosure of the FDA's first concern (the negative overall survival data) undercut his scienter with respect to the decision not to disclose the FDA's other concern (that Tivo needed a second clinical trial). Cf. Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc., 778 F.3d 228, 243 (1st Cir. 2015) (finding that scienter was lessened because Abiomed 1) "explicitly warned investors" that the FDA might find the company's marketing practices to be illegal and 2) promptly disclosed the FDA's warning letter).  As such, the Court finds, as did the jury, that Johnston possessed the requisite scienter, and thus, this factor weighs in favor of imposing some degree of officer and director bar.

**5. Defendant's economic stake**

The SEC alleges that because Johnston's success was linked to that of Aveo's, he had a substantial economic stake in the fraud.  It argues that Johnston and his team took a substantial business risk in deciding to file the NDA without conducting the recommended clinical trial, and that while investors and employees suffered because of that business risk, Johnston remained largely unscathed as he subsequently left Aveo to become CFO of ImmunoGen.  Johnston responds that his economic stake during the scheme was minimal because 1) he had more

shares after the scheme than before and 2) during the scheme, he sold only 6% of his holdings. The Court concludes that Johnston's economic stake in the violations was minimal given his ownership of shares and, thus, this factor adds little support to imposing a bar.

### 6. Likelihood of recurrence

The likelihood of recurrence is of particular importance when determining whether, or to what extent, an officer and director bar is appropriate. Selden, 632 F. Supp. 2d at 99 (citing Patel, 61 F.3d at 141-42). The SEC alleges that the possibility of future violations looms large because 1) Johnston maintains a consultant position at ImmunoGen (with comparable compensation to his prior CFO role), 2) ImmunoGen is awaiting this Court's final judgment before deciding whether to dismiss Johnston altogether and 3) the risk of recurrence is high. In response, Johnston points to his record of compliance with securities laws, the unlikelihood of recidivism, the stigma and punitive effect of a formal bar and the uncertainty of his future employment in the biopharmaceutical industry.

While Johnston's decision to withhold material information may have been an aberration to his otherwise spotless record, Johnston currently holds a consultant role at a public biopharmaceutical company, and thus, there is a risk of recurrence. Selden, 632 F. Supp. 2d at 99. Moreover, while

Johnston should not be prejudiced with respect to the imposition of an injunction simply because he presented a vigorous defense at trial, he continues to argue, at this stage, that he lacked the requisite scienter because of his good faith reliance on counsel. See SEC v. Ingoldsby, No. CIV. A. 88-1001-MA, 1990 WL 120731, at *3 (D. Mass. May 15, 1990) (finding that absent a showing of bad faith, the defendant should not be prejudiced for presenting a vigorous defense at trial).  Such a defense contravenes any assurance against future misconduct and weighs in favor of imposing some kind of officer and director bar. Selden, 632 F. Supp. 2d at 99.

### 7. Other factors

The SEC avers that the Patel factors are not mandatory or exclusive and that the Court should consider 1) Johnston's lack of sincerity or recognition of the wrongful nature of his conduct and 2) the likelihood that he will be presented with future opportunities to violate securities laws if allowed to hold a position of trust and confidence. Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd, 450 U.S. 91 (1981) (identifying the following factors for unfitness: the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful

nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations).

While the Court finds that Johnston's reliance-on-counsel quasi-defense demonstrates a lack of assurance against future misconduct, Johnston was not without remorse.  At trial, he took responsibility for Aveo's disclosures and corporate statements, and thus, the factor of lack of sincerity is not compelling here.  Moreover, the Court has taken into consideration Johnston's proclivity toward recurrence when evaluating the Patel factors.  Accordingly, the additional Steadman factors that the SEC raises are unavailing.

### 8. Conclusion

The Court finds that Johnston's fraudulent conduct was serious, that he played a significant role in the fraud and that he acted with the requisite scienter.  His conduct does not warrant permanent exclusion from the corporate suite but a two-year bar should be sufficient to deter any future misconduct and to impress upon Johnston the gravity of his violations.  Such a penalty will strike an appropriate balance between protecting investors and avoiding an unduly harsh permanent ban from any future employment in the securities industry.

### B. Disgorgement

The district court has broad equitable power to fashion appropriate remedies, including disgorgement, which does not

serve to punish or fine the wrongdoer but is intended to prevent unjust enrichment. SEC v. Druffner, 802 F. Supp. 2d 293, 297 (D. Mass. 2011); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996).  The measure of unjust enrichment for any given securities violation depends, however, on the nature of the violation and the defendant's wrongful conduct. SEC v. Wyly, 56 F. Supp. 3d 394, 426 (S.D.N.Y. 2014).  For example, courts commonly order defendants to disgorge not only the proceeds of a fraud but also salary and bonuses earned during the period of a fraud and amounts equivalent to losses avoided as a result of the securities violation. Id.

The SEC submits that Johnston sold 3,597 shares of Aveo stock during the alleged scheme to defraud (August 2, 2012, through April 30, 2013) and that the FDA disclosure on the latter date caused Aveo's stock price to fall by $2.32 per share.  Thus, a reasonable estimate of the loss avoided would be $8,345 (3,597 shares times $2.32).

Johnston responds that the SEC has not established that the alleged profit (or avoided loss in this case) was "causally connected to the violation".  He contends that one of sales was required by the Rule 10b5-1 trading plan (vesting of 1,150 shares of restricted stock) and would have occurred regardless of Aveo's stock price.  He suggests that, with respect to the other two sales, the total avoided loss was minimal (2% of his

annual salary) and because he had more shares post-scheme than he did pre-scheme there is a lack of causation between the avoided loss and the securities violation.

Once the SEC establishes a reasonable approximation of the amount of unjust enrichment, the burden shifts to the defendant to demonstrate that the "loss avoided" was not a reasonable approximation and that there was a "clear break in or considerable attenuation of the causal connection between the illegality and the ultimate profits". SEC v. Happ, 392 F.3d 12, 32 (1st Cir. 2004).  Johnston has demonstrated that his 1,150 shares of restricted stock would have been divested regardless of stock price and thus the SEC has failed to satisfy a causal connection between the illegality and the ultimate profit.  As to the remaining divestitures, Johnston has offered no alternate calculation but instead relies on the de minimis nature of the loss in proportion to his total sales.  As the wrongdoer, Johnston bears the risk of uncertainty in calculation the amount of disgorgement. Id.  Accordingly, Johnston will be required to disgorge a total of $5,677, the reasonable approximation of avoided loss less the proceeds on the unrelated mandatory divesture.

### C. Prejudgment Interest

The SEC argues that Johnston should be subject to prejudgment interest on disgorgement.  Because he does not

oppose that request, it will be granted. Accordingly, Johnston is ordered to pay prejudgment interest on the adjusted disgorgement amount of $5,677, in accordance with the IRS underpayment rate. First Jersey Sec., Inc., 101 F.3d at 1476.

### D. Civil Penalties

The SEC moves for the Court to impose a Tier III penalty of up to $150,000 for each violation pursuant to § 21(d)(3)(A) of the Exchange Act and § 20(d) of the Securities Act. It submits that Johnston's conduct was egregious, carefully planned and created a substantial risk of loss for the purchasers of Aveo stock between August 2, 2012, and April 30, 2013. Johnston responds that, at most, he should be subject to a Tier II penalty for a single violation because the SEC has failed to meet its burden of demonstrating "substantial loss".

> A Tier III penalty is appropriate when
>
> the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.
>
> 15 U.S.C. § 77t(d)(2)(C).

The Court finds that the SEC has satisfied its burden of proving "substantial loss" because even defendant's own expert, Dr. Gompers, testified that there was an aggregate equity valuation loss of over $100 million when the FDA disclosed its

recommendation on April 30, 2013. Thus, a Tier III penalty is warranted.

Within Tier III, the Court has the discretion to impose, for each violation, up to $150,000 penalty or Johnston's gross amount of pecuniary gain, whichever is greater. 17 C.F.R. § 201.1001 & Tbl. I (increasing the maximum Tier III penalty from the statutory limit of $100,000 to $150,000 to account for inflation). The Court may also consider the following factors when determining the appropriate fine: the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violation, the degree of scienter involved, the defendant's cooperation or lack thereof with authorities and the defendant's current financial condition. SEC v. Esposito, 260 F. Supp. 3d 79, 93 (D. Mass. 2017).

As described above in the context of the officer and director bar, the Court finds that Johnston acted with the requisite scienter but that his fraudulent conduct was isolated to this incident and was not particularly egregious. Accordingly, the factors weigh in favor of imposing a penalty less than the statutory maximum. Cf. Weed, 315 F. Supp. 3d at 677 (D. Mass. 2018) (where the Court imposed the statutory maximum for a Tier III penalty when the defendant engaged in a pump-and-dump scheme). Moreover, the Court finds that

Johnston's scheme to defraud warrants a single penalty. SEC v. Interinvest Corp., Inc., No. CV 15-12350-MLW, 2016 WL 8711689, at *1 (D. Mass. Dec. 23, 2016) (holding that where a defendant has violated a number of securities laws in carrying out a single scheme, it is appropriate to impose a single penalty on each defendant).  Accordingly, Johnston will be ordered to pay a civil penalty of $120,000 for his scheme to defraud.

### E. Permanent injunction

A permanent injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future. SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994).  In making that determination, the Court considers:

> whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future.
>
> SEC v. Druffner, 517 F. Supp. 2d 502, 513 (D. Mass. 2007), aff'd sub nom. SEC v. Ficken, 546 F.3d 45 (1st Cir. 2008).

Consistent with the analysis expounded above, the Court finds that Johnston's fraudulent conduct was deliberate but not flagrant and that he may well be presented with opportunities to violate the law in the future.  Accordingly, he is permanently enjoined from violating securities laws.

**ORDER**

For the foregoing reasons, the SEC's motion for final judgment (Docket No. 232) is **ALLOWED**, in part, and **DENIED**, in part.  The Court imposes a two-year officer and director bar, disgorgement of $5,677 plus prejudgment interest, a civil penalty of $120,000 and a permanent injunction.

**So ordered.**

                                              /s Nathaniel M. Gorton  
                                              Nathaniel M. Gorton  
                                              United States District Judge

Dated March 21, 2019